**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **EDWARD BUKSTEL,** | : |
| **Plaintiff,** | : |
| **v.** | :     **CIVIL ACTION NO. 13-3287** |
| | : |
| **DEALFLOW MEDIA, INC. et al.,** | : |
| **Defendants.** | : |

---

### MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                              **August 12, 2014**

Edward Bukstel, a Pennsylvania resident and the CEO and majority shareholder of VitaminSpice, Inc., a publicly-traded company, has sued defendants for defamation, alleging that Defendants published false and defamatory statements about him in the weekly and on-line periodical, *The DealFlow Report*. *The DealFlow Report* is published by Defendant DealFlow Media, Inc. Before the Court are two motions to dismiss the Second Amended Complaint, one filed by defendant Steven Dresner, DealFlow Media's CEO pursuant to 12(b)(2), seeking dismissal on the basis that the Court lacks personal jurisdiction over him, and the second filed by all defendants, seeking dismissal for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6).

## I.   BACKGROUND[1]

*The DealFlow Report* is a weekly periodical that provides information about "niche areas of finance" to clients and professionals in the financial field, including investment managers, banks, hedge funds, and financial companies. On March 4, 2013, *The DealFlow Report* published a front-page article ("the Article") titled "VITAMINSPICE CEO SAYS HE

---

[1] The facts are taken from the Second Amended Complaint ("Complaint") and the attachment thereto, and facts taken from the Complaint are assumed true for the purposes of resolving the Motions to Dismiss.

REQUESTED TRADING HALT AMID DISPUTE OVER STOCK MANIPULATION."[2] The Article's first sentence read: "The chief executive of . . . [VitaminSpice] says that he asked the SEC [(Securities and Exchange Commission)] to issue an order halting trading in the company's stock, amid a dispute with his former attorney who he accuses of stock manipulation." Finally, adjacent to the Article's headline, "the first bullet of the column entitled 'Market Update' read[] 'The CEO of VitaminSpice says he requested a trading halt amid a dispute over stock manipulation.'"[3] This suit challenges these three statements as false and defamatory. Bukstel does not challenge the veracity of any other statements in the lengthy Article.

The Article goes on to report that Vitamin Spice CEO "Edward Bukstel, of Wayne, Pa., told *The DealFlow Report* that four days earlier, he had provided a court document to the SEC showing that a federal judge in Philadelphia had denied a request to end litigation over the dispute" with the company's former attorney, Jehu Hand,[4] whom Bukstel had accused of stock manipulation. The Article summarizes a statement provided by the SEC on this issue, which did not confirm that the SEC had received any court documents from Bukstel.[5] The article describes ongoing litigation between Bukstel and Hand, stating that Hand had sued Bukstel and VitaminSpice, alleging "improper accounting and that Bukstel drank during work hours and spent company funds on adult entertainment."[6] The article also discusses VitaminSpice's counterclaims against Hand, alleging fraud, breaches of fiduciary duties, and misrepresentation, quoting a VitaminSpice court filing which read: "Hand engaged in manipulative trading practices and embarked upon a pump-and-dump scheme based on false statements that artificially inflated

---

[2] Compl. Ex. A.

[3] Compl. ¶19.

[4] The article notes that Jehu Hand denies being the company's attorney.

[5] Compl. Ex. A.

[6] Compl. Ex. A.

the price of VitaminSpice stock. . . . Then Hand dumped the stock and crashed its price to levels from which it has never recovered, causing substantial damage to Bukstel and other VitaminSpice shareholders."[7]

Bukstel alleges that he learned about the Article on the day it was published, and immediately contacted the Defendants to inform them that the Article's title and content were false, as he never he never requested a trading halt on VitaminSpice stock and never said that he requested a trading halt from the SEC. He also informed Defendants that the Article jeopardized a deal he was negotiating to sell the company assets to an investor for approximately eight million dollars. Bukstel alleges that Defendants "acknowledged the falsity of the title and opening line but simply ignored [his] request" for a public retraction and apology.[8] Bukstel alleges that Defendants instead changed the online version of the Article's title to "'VitaminSpice Halted Amid Dispute Between CEO, Attorney Over Stock Manipulation' and the opening line to 'The chief executive of the microcap company VitaminSpice Inc. (VTMS) says that he provided a document to the [SEC] . . . .'"[9] Bukstel does not allege that the modified title and opening line were defamatory. Bukstel does allege that Defendants did not modify the Market Update entry, and so that continued to contain a false and defamatory statement in the online issue.

In the next print edition of the *The DealFlow Report,* dated March 11, 2013, a "Correction" appeared which noted that the Article had mischaracterized Bukstel's role in the SEC's decision to halt trading of VitaminSpice stock, and stated that "Bukstel provided a

---

[7] Compl. Ex. A.

[8] Compl. ¶ 25.

[9] Compl. ¶ 25.

document to the SEC that may have led to the decision."[10] Bukstel alleges that this correction was "buried deep on the twelfth page" and was also defamatory, in that it suggests he may have had some role in the SEC decision to halt trading.

In this suit for defamation, Bukstel denies that he ever requested a trading halt on VitaminSpice stock or told Defendants that he requested a trading halt on the stock.[11] Bukstel alleges that Defendants' statements indicating that he asked the SEC to halt trading or otherwise had a role in the SEC's decision are false and have caused him reputational and financial harm.[12] However, he does not deny that the correction is true—i.e., that he provided a document to the SEC regarding VitaminSpice's lawsuit against Hand for stock manipulation. Nor does he deny that the SEC halted trading in VitaminSpice just four days after Bukstel provided it with a January 2014 judicial opinion denying a motion to dismiss his claims against Hand.

With regard to the reputational and financial harm, he pleads that publication of the defamatory information "caused skepticism" amongst current and potential VitaminSpice investors, "who were caused to believe that Plaintiff's business judgment was seriously impaired" by the statement that he, as CEO of a publicly traded company, asked the SEC to halt trading on his company.[13] He further alleges that such statements make it appear that Plaintiff was in dereliction of his fiduciary duty to the company. As a result, he alleges he has suffered severe reputational and financial harm.

---

[10] Compl. Ex. B.

[11] Compl. ¶¶ 20-21.

[12] Compl. ¶¶ 30-38.

[13] Compl. ¶ 32.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 4(k)(1)(A) holds that a federal district court may exercise personal jurisdiction over a defendant "to the extent permissible under the law of the state where the district court sits."[14] Pennsylvania's long-arm statute provides for jurisdiction "to the fullest extent allowed under the [U.S.] Constitution . . . ."[15] Under the Due Process Clause of the Fourteenth Amendment, the court may exercise personal jurisdiction over the defendant as long as the defendant has "certain minimum contacts with [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[16] "[C]ourts reviewing a motion to dismiss a case for lack of in personam jurisdiction must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."[17] However, "once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction."[18] In evaluating a motion to dismiss for personal jurisdiction, the Court must take the plaintiff's allegations as true and draw all reasonable inferences in favor of the plaintiff, but the plaintiff must support his allegations with something more than a bare pleading, like a sworn declaration or affidavit or other competent evidence.[19]

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court also must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

---

[14] *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).

[15] 42 Pa. Con. Stat. Ann. § 5322(b).

[16] *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)).

[17] *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

[18] *Id.* at 146.

[19] *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 101 n.6 (3d Cir. 2004).

to relief."[20] In order "to survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."[21]

## III.   DISCUSSION

### A.   Dresner's Motion to Dismiss for Lack of Personal Jurisdiction

DealFlow Media's CEO, Steven Dresner, has moved to dismiss for lack of personal jurisdiction.[22] There are two types of personal jurisdiction: general and specific.[23] The Court must evaluate the facts regarding jurisdiction to determine whether they support either type.

Dresner is a California resident whose principal place of business is in California.[24] Dresner maintains that he does not own property in Pennsylvania and has no connections to Pennsylvania other than occasionally traveling through the Commonwealth.[25] Dresner also asserts that his responsibilities as DealFlow Media's CEO include new product development, corporate strategy, and business development; he denies having any role in preparing, approving, revising, or correcting any version of the Article.[26]

As noted above, once a challenge to personal jurisdiction is raised, Bukstel bears the burden of putting forth evidence in support of jurisdiction. Here, Bukstel has provided no declarations or affidavits, attaching to his brief only a copy of the article (which was also attached to the Complaint) and a copy of an email exchange between Bukstel and Dresner after the allegedly defamatory article was published, in which he informs Dresner of his intent to sue for defamation and asks him to "take control of this defamation right now," to which Dresner

---

[20] *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted).

[21] *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citation and internal quotation marks omitted).

[22] Dresner's Mot. Dismiss, Doc. No. 14-1 at1.

[23] *D'Jamoos*, 566 F.3d at 102.

[24] Compl. ¶ 3.

[25] Dresner Decl., Doc. No. 14-2 ¶¶ 8-12.

[26] Dresner Decl. ¶¶ 3-7.

responded that he would speak to his managing editor "to find out what is happening" upon his return from Europe in one week.[27]

### 1. General Jurisdiction

General jurisdiction requires that the defendant have "continuous and systematic" contacts with the forum state.[28] Bukstel does not argue that Dresner has continuous and systematic contacts with the forum state, but rather argues that the Court may have general jurisdiction over Dresner, and the Court should allow discovery on this issue.[29] However, general jurisdiction will rarely exist over an individual outside his place of domicile.[30] Here, because Dresner is a California resident who has no noteworthy personal or business ties to Pennsylvania,[31] and Bukstel has not pled any facts from which the Court can infer that discovery is likely to reveal evidence supporting general jurisdiction, the Court holds that it does not have general jurisdiction over Dresner.[32]

### 2. Specific Jurisdiction: Minimum Contacts Test

Specific jurisdiction typically requires satisfying a three-part test: First, the defendant must have "purposefully directed [his] activities" at the forum. Second, the litigation must "arise out of or relate to" at least one of those activities. And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"[33]

---

[27] Pl.'s Reponse, Ex. B., Doc. No. 17-3.

[28] *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984).

[29] Pl.'s Response at 6.

[30] *See Goodyear Dunlop Tire Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . .").

[31] *See* Dresner Decl., Doc. No. 14-1, Ex. A. ¶¶ 8-12.

[32] Mem. Supp. Def. Dresner's Mot. Dismiss at 1-2; Dresner Decl. ¶¶ 5-7, 12.

[33] *D'Jamoos*, 566 F.3d at 102 (citations omitted).

It is not apparent from the Complaint or Plaintiff's response to the jurisdictional motion that Defendant Dresner purposefully directed any activities at the forum. His company produces a publication, which is circulated nationally or internationally. Dresner's role in producing and distributing that publication has not been established by affidavit, declaration or any competent evidence. The only specific contact between Dresner and Pennsylvania pointed to by Bukstel is an email sent from Dresner, on vacation in Europe, to Bukstel in Pennsylvania, responding to an email from Bukstel. The litigation does not arise out of or relate to that email correspondence, but rather arises out the publication of the Article; the email merely addressed Bukstel's complaint about the already published article. There is no evidence in the record indicating that personal jurisdiction exists under the traditional minimum contacts test.

### 3. *Specific Jurisdiction: Effects Test*

In a case such as this, involving an allegation of an intentional tort, the Court may also analyze personal jurisdiction using the "effects test," which has three elements:

> First, the defendant must have committed an intentional tort. Second, the plaintiff must have felt the brunt of the harm caused by that tort in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort. Third, the defendant must have expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.[34]

This "effects test prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state."[35]

Bukstel argues that the *IMO Industries* effects test is satisfied here, and that the Court therefore has specific jurisdiction over Dresner, because: 1) Dresner, in his role as CEO of

---

[34] *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 256 (3d Cir. 1998) (citing *Calder v. Jones*, 465 U.S. 783 (1984)).

[35] *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007).

DealFlow Media, committed the intentional tort of defamation; 2) Bukstel's "home and business are located in Pennsylvania . . . causing him to feel the brunt of the harm there"; and 3) Dresner, personally, "expressly aimed tortious conduct at Pennsylvania by participating in the publication of [the Article], which was disseminated to *DealFlow*'s wide-reaching subscribership, many of whom work and reside in Pennsylvania . . . ."[36]

Dresner argues that Bukstel has not satisfied the first prong of the effects test because "personal jurisdiction must be premised on the credible allegation of an intentional tort," and Bukstel only "makes various general and conclusory allegations against the defendants as a group, but alleges no specific [defamatory] behavior by Dresner . . . other than that he was the CEO of DealFlow Media."[37] Dresner has provided a declaration in which he states that he did not participate in the writing or editing of the Report and played no role in preparing the Article or approving it for publication, and also no role in the revision or corrections.[38] Therefore, he argues, Bukstel cannot credibly allege that Dresner, personally, has committed an intentional tort.

Neither *Calder* or *IMO Industries* requires a plaintiff to put forth a sworn declaration or affidavit and other competent evidence to satisfy the first element of the effects test. Unlike the second and third elements of the effects test, which speak to whether the alleged conduct was calculated to cause harm in the forum, the first element of the effects test does not speak to the relationship between the defendant and the forum. Therefore, the Court holds that Bukstel need not put forth *evidence* in support of his claim for defamation in order to resolve the jurisdictional

---

[36] Pl. Response at 7-8.

[37] Mem. Supp. Def. Dresner's Mot. Dismiss at 5.

[38] Dresner Decl. ¶¶ 4, 6, 7.

question. [39] However, the Court holds that Bukstel has not adequately pled that Dresner personally played a role in the writing, editing, publication, distribution, or correction of the Article, and therefore the Complaint does not adequately plead that Dresner committed the intentional tort of defamation. On the current record, Bukstel has not satisfied the first element of the effects test, and the Court cannot find that it has personal jurisdiction over Dresner. [40]

### B.    Defendants' Motion to Dismiss For Failure to State a Claim

A plaintiff claiming defamation under Pennsylvania law must adequately allege that the challenged statements are materially false, and must also adequately allege : 1) the defamatory character of the communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) the understanding by the recipient of its defamatory meaning; 5) the understanding by the recipient of it as intended to be applied to the plaintiff; 6) special harm resulting to the plaintiff from its publication; and 7) abuse of a conditionally privileged occasion. [41] Pennsylvania defamation law does not ask this Court to consider the effect that the Article may have had on the average person, but rather the effect that it may have had on the average reader of *The DealFlow Report* or on other individuals who may have encountered the statements. [42] Using this subset of people as a yardstick, this Court must determine whether the Article "tends to blacken [Bukstel's] reputation or expose him to public hatred, contempt, or ridicule or injure him in his business or profession." [43]

---

[39] *See, e.g.*, *Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001) (finding that the plaintiff met this prong by alleging defamation merely because "[d]efamation is an intentional tort").

[40] Dresner does not challenge the second and third elements of the effects test.

[41] 42 Pa. Cons. Stat. Ann. § 8343(a) (2014).

[42] *See Remick*, 238 F.3d at 261 (holding that the court should consider the effects of the statement "in the minds of average persons *among whom it is intended to circulate*") (emphasis added) (citation and internal quotation marks omitted).

[43] *Cosgrove Studio & Camera Shop, Inc. v. Pane*, 408 Pa. 314, 317 (1962).

As the Defendants' arguments do not require the Court to decide whether the challenged statements in the original article were materially false, the Court will assume, without deciding, that those statements were false, solely for the purposes of this analysis. Whether the communication is capable of defamatory meaning is a matter of law to be determined by the Court at an appropriate stage in the litigation.[44] In making this assessment, the court considers "whether the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him."[45] The court must then contextually evaluate whether this is the effect the statement is "fairly calculated to produce . . . in the minds of the average persons among whom it is intended to circulate."[46] Ultimately, "[w]hile it is not enough that a statement is embarrassing or annoying, a court should not dismiss a complaint unless it is clear that the publication is incapable of a defamatory meaning."[47]

Generally, defamatory statements that involve a plaintiff's professional reputation or ability to do his job describe the plaintiff as—or imply that he is—dishonest, lacking in integrity, or guilty of criminal wrongdoing.[48] Here, Bukstel alleges that Defendants published three defamatory statements in the March 4, 2013 edition of their "highly regarded, industry-specific

---

[44] *See Gibney v. Fitzgibbon*, 547 F. App'x 111, 113 (3d Cir. 2013) (citing *Kurowski v. Burroughs*, 994 A.2d 611, 617 (Pa. Super. Ct. 2010)).

[45] *Tucker v. Phila. Daily News* (*Tucker II*), 577 Pa. 598, 615 (2004) (citation and internal quotation marks omitted).

[46] *Tucker v. Fischbein* (*Tucker I*), 237 F.3d 275, 282 (3d Cir. 2001) (citation and internal quotation marks omitted).

[47] *Id.* (citations and internal quotation marks omitted).

[48] *See, e.g.*, *Genesis Intern. Holdings*, 238 F. App'x 799, 802 (3d Cir. 2007) (dishonest); *Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183, 186-87 (3d Cir. 1999) (guilty of criminal wrongdoing); *Krause v. Security Search & Abstract Co. of Phila., Inc.*, Nos. Civ.A. 96-595, Civ.A. 96-5742, 1997 WL 528081, at *9 (E.D. Pa. Aug. 21, 1997) (dishonest); *Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 167 A.2d 472 (1960) (lacking in integrity); *Agriss v. Roadway Exp., Inc.*, 334 Pa. Super. 295, 306, 483 A.2d 456, 462 (1984) (dishonest, lacking in integrity, and guilty of criminal wrongdoing).

magazine" *The DealFlow Report*,[49] each of which said that Bukstel asked the SEC to halt trading in VitaminSpice stock during a dispute with his attorney, whom he had accused of stock manipulation.[50] Defendants argue that the challenged statements are incapable of defamatory meaning as a matter of law, because they describe Bukstel as aiding the SEC in order to protect his shareholders, without implying that he did so in order to escape punishment for his own acts.[51, 52] Under similar circumstances, they argue, courts have held that "identifying someone as a government informant is not defamatory as a matter of law."[53]

The Court finds Defendants' reasoning persuasive. Statements indicating that Bukstel voluntarily asked a federal law enforcement agency to take an action to prevent further wrongdoing and protect the investing public, even if false, hardly paint him as dishonest, lacking in integrity, or guilty of criminal wrongdoing.  To the contrary, reading the allegedly false statements, a reader could infer that Bukstel is someone who looks out for the financial interests of his company's shareholders and willingly assists law enforcement, even when doing so may not be in his own self-interest. While a CEO asking the SEC to halt trading in the company he leads may be unusual, the Court cannot find that an article reporting that Bukstel took such an action in light of suspected stock price manipulation is capable of blackening Bukstel's reputation in the financial community. Thus, in line with the general rule that "identifying

---

[49] Br. Supp. Pl.'s Resp. Opp. Defs.' Mot. Dismiss at 13, ECF No. 16.

[50] Compl. ¶¶ 17-19; Compl. Ex. A at 1.

[51] Mem. Supp. Defs.' Mot. Dismiss at 8-10, ECF No. 13-1. Defendants also "reserve their right to argue later, should it be necessary, that Bukstel cannot prove the other requisite elements of his claim," but confine their present 12(b)(6) arguments to whether the statements are capable of defamatory meaning. *See id.* at 8 n.9.

[52] *See Marcone v. Penthouse Intern. Magazine for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985) (finding statement referring to plaintiff's cooperation with law enforcement capable of defamatory meaning because it "suggest[ed] that [plaintiff] committed a crime).

[53] *See, e.g.*, *Michtavi v. New York Daily News*, 587 F.3d 551, 552 (2d Cir. 2009) (affirming dismissal of claim alleging statement that plaintiff cooperated with law enforcement was defamatory, because "every American court surveyed has held that identifying someone as a government informant is not defamatory as a matter of law").

someone as a government informant is not defamatory as a matter of law,"[54] the Court finds that Defendants' statements about Bukstel asking the SEC to halt trading are similarly incapable of being defamatory.

Moreover, it is difficult to imagine what sorts of negative inferences about Bukstel's competence or decision making members of the financial community could draw from the allegedly defamatory statements that they could not draw from the corrected statements or the separate—and completely undisputed—statements made in the Article regarding Bukstel's lawsuit against his former attorney for stock manipulation. For example, although Bukstel argues that *The DealFlow Report*'s business-savvy readers would naturally, *but erroneously*, infer from these statements that Bukstel "had information to warrant the trading halt, supported it and/or encouraged an interference with trading of the stock,"[55] reading the modified title and opening sentence published online, which Bukstel does not challenge as defamatory, one would also "naturally" infer that Bukstel had information to warrant the trading halt, and perhaps even supported or encouraged the halt in trading, as he chose to provide the SEC with a judicial decision which found his allegations of fraud and stock manipulation were adequately pled, and the SEC halted trading four days later. Additionally, given the contents of the article as a whole, the Court cannot hold that any injury allegedly suffered (embarrassment, increased investor caution, the termination of sale negotiations) can be tied specifically to the allegedly false title and opening sentence.

Accordingly, the Court holds that Bukstel has not alleged facts from which the Court can conclude that the allegedly false statements in the Article tend "to blacken [Bukstel's] reputation or expose him to public hatred, contempt, or ridicule or injure him in his business or

---

[54] *Michtavi*, 587 F.3d at 552 (citing *Agnant*, 30 F. Supp. 2d at 424).

[55] Br. Supp. Pl.'s Resp. Opp. Defs.' Mot. Dismiss at 13.

profession."[56] As the statements, read in context, are not capable of defamatory meaning, Bukstel's claims must be dismissed.

**IV.   CONCLUSION**

For the foregoing reasons, Dresner's motion to dismiss for lack of personal jurisdiction and all Defendants' motions to dismiss for failure to state a claim will be granted. An appropriate order follows.

---

[56] *Cosgrove Studio & Camera Shop, Inc. v. Pane*, 408 Pa. 314, 317 (1962).